CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

DEC 14 2020

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| ALLISON COATES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:19cv00049 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SUTHARS, INC., d/b/a KARE | ) | |
| PHARMACY AND COMPOUNDING, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Until she was fired in August 2018, Plaintiff Allison Coates worked as a sales representative for Defendant Suthars, Inc., d/b/a Kare Pharmacy and Compounding ("Kare"), a large compounding pharmacy and manufacturer of specialized prescription drugs, headquartered in Danville. Kare's then-chief operating officer ("COO") and part-owner, Jay Suthar ("Suthar"), unilaterally made the decisions to hire and later fire Coates, and his alleged conduct while she was employed there gives rise to this lawsuit.[1]

After her termination, Coates filed this suit under Title VII of the Civil Rights Act of 1964, alleging a sexually hostile work environment and unlawful retaliation perpetrated by the defendant—namely Suthar. Coates alleges that beginning immediately after Suthar hired her and continuing for approximately seven months thereafter, he continually made unwanted romantic and implicitly sexual advances towards her, culminating in a marriage proposal made over dinner at a Mexican restaurant in January 2018. Coates further alleges that after she firmly

---

[1] Jay Suthar's parents founded the business, and his father, Prakash Suthar, was its CEO at the time Coates worked there. Jay Suthar succeeded his father as CEO sometime after he fired Coates.

rebuffed Suthar's marriage proposal, he began to actively undermine her success at Kare over the next seven months. According to Coates, Suthar's animus towards her, which she alleges was the direct result of her refusal be in a romantic relationship with him, was manifested in various ways: excluding her from key meetings, imposing unreasonable technological demands on her, failing to rectify glitches in software and other IT issues that made it difficult for her to meet these new technological demands, and openly criticizing her job performance despite achieving record-breaking sales numbers. According to Coates, as the natural conclusion to his months-long campaign to undermine her, Suthar fired her.

The defendant has moved for summary judgment, arguing that Suthar's romantic interest in and attendant conduct towards Coates over her first seven months at Kare "does not establish the existence of a hostile work environment" that is actionable under Title VII. Kare further argues that Coates's retaliation claim fails as a matter of law because the undisputed evidence demonstrates that Suthar terminated her because of "documented issues with her employment." (Def.'s Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Br."] pg. 1 [ECF No. 56].)

The court has carefully reviewed the entire record and concludes that Coates has adduced sufficient facts from which a reasonable jury could find that Suthar's conduct satisfied the elements of a hostile work environment claim, and that his decision to terminate her employment constituted unlawful retaliation. The court will therefore deny the motion for summary judgment.

I.     **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[2]

In June 2017, Jay Suthar hired Allison Coates as a sales representative for Kare. Coates, who had recently graduated from Virginia Tech, applied for the position at the suggestion of her aunt, who at that time directed marketing for the pharmacy. Suthar interviewed Coates in his office in Danville and offered her a job a few days later. Other than working her way through college as a pharmacy technician, Coates's position at Kare was her first full-time job, and she had no prior sales or marketing experience.

Immediately after her hiring, Coates spent some time at Kare's Danville headquarters learning how the business worked before beginning her day-to-day responsibilities of visiting doctors and other health-care professionals in her assigned geographic region to market Kare's compounded drugs. Although Suthar, as COO of the entire company, which operates in multiple states and earns annual revenues of approximately $10 million, was not Coates's direct supervisor, Coates alleges—and others corroborate—that Suthar took a noticeable interest in her and, at least for a while, effectively acted as her day-to-day supervisor.

Coates contends that she interacted frequently with Suthar during her first six months on the job. After she completed her training, she returned to the Danville office at least two or three times a month, and Suthar would often accompany her on sales calls to doctors' offices, riding with her in the car and watching her pitch to potential clients. Coates described her interactions with Suthar as follows:

> So he was someone who I would ask questions to, interact with, especially in the beginning, in the first six months, and try to get

---

[2] The court summarizes the facts in the light most favorable to Coates, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), even where there are "disputed events that [she] may not ultimately be able to prove [at trial]," *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 205 n.1 (4th Cir. 2014).

direction from about how he wanted his marketing person to grow the business as well.

(Allison Coates Dep. 54:4–8, Nov. 3, 2020 [ECF No. 60-1].) Coates and Suthar also regularly communicated through text messaging and daily phone calls during this period. (Coates Dep. 54:14–55:7.) Although Suthar frequently rode with Coates to visit doctors' offices, she recalls that he rarely provided any feedback or advice on how to make sales calls. When Coates asked for his input, Suthar replied: "This is your job. You should know how to do it. I just like watching you." (Coates Dep. 70:6–7.)

Within a month of her hiring, Suthar began to express a romantic interest in Coates. She vividly recalls a conversation with him in her car as she drove him back to the airport, where he had left his private plane. Before getting out of the car, Suthar told Coates that he really enjoyed being with her and that he probably liked her "too much." (Coates Dep. 74:18–75:15.) According to Coates, at this point Suthar "asked [her] out romantically, to which [she] declined," explaining that it was her desire to keep her personal and professional lives separate. (Coates Dep. 75:2–3.) Coates asserts that as she tried to explain her position, Suthar abruptly cut her off, saying, "So you don't shit where you eat?" (Coates Dep. 75:8–9.)

Apparently undaunted by her initial refusal to go out with him, Suthar asked her out to dinner frequently when she visited the Danville office. (Coates Dep. 132:22–133:7; 177:5–11.) Coates testified that Suthar's initial advances "creeped [her] out" and generally made her uncomfortable. (Coates Dep. 84:9, 132:3.)

In July 2017, shortly after the airport incident, Suthar sent Coates a series of text messages inviting her to accompany him on his plane to Tangier Island.[3] (Def.'s Br. Ex. H [ECF No. 56-2]; Coates Dep. 135:9–138:6.) In extending this invitation, Suthar texted: "I was also thinking of dropping into Richmond on the way there or back if I'm feeling saucy." (Def.'s Br. Ex. H.) Coates declined the invitation. She also recalls another incident in Suthar's office in Danville, relatively close in time to Suthar's initial advances, when Suthar asked if an acquaintance had "hit on" her. Coates demurred and told Suthar that she could take care of herself. (Coates Dep. 119:10–120:3.)

Coates contends her refusal of Suthar's initial advances caused him to be more critical of her job performance. Specifically, Coates recalls that after she declined to go out with him multiple times, Suthar, who until that point had mainly offered praise and "positive feedback," began to be more negative about her progress and wrote terse emails. (Coates Dep. 105:20–107:15.) In Coates's mind, there was a direct correlation between her reaction to Suthar's romantic interest and his assessment of her performance, and she worried that her refusal to accede to his romantic entreaties would jeopardize her fledgling career. Coates explained her concerns as follows:

> It felt to me . . . okay, well, I said no to him—it raised a red flag.
> It raised a question in my head of, okay, is this going forward?
> This was the moment that I kind of knew this week, okay, he has
> already asked me out, I've said no. Now is it going to be a
> problem? And then it did continue on and became a bigger
> problem with future interactions that were much worse than this.

(Coates Dep. 111:8–16.)

---

[3] Tangier Island is located in the Chesapeake Bay, near the Eastern Shore of Virginia.

The first of those future interactions occurred a few months later, in October 2017, when Coates accompanied Suthar and pharmacist-in-charge Ed Breslow to an overnight professional event in Richmond. After the scheduled event ended, the three of them made plans to go out to dinner. For some reason, Breslow did not show up at the restaurant, leaving Suthar and Coates to dine alone. Both of them consumed alcohol at dinner, and Suthar apparently became intoxicated. After returning to the hotel around midnight and going to their separate rooms, Suthar sent Coates a series of text messages, including one telling her that she "shouldn't be expecting him to wear pants at breakfast the next morning." (Def.'s Br. Ex. I [ECF No. 56-2].)

At breakfast the next day, Breslow asked Coates if she was dating anyone. After a brief exchange on this topic and some joking about marrying for money—which occurred in Suthar's presence—Suthar became angry. According to Breslow and Coates, in the car on the way to visit a doctor's office, Suthar "blew a gasket," lashing out at Coates in front of Breslow and criticizing her job performance. (Ed Breslow Dep. 26:10–11, Nov. 5, 2020 [ECF No. 60-4]; *see also* Coates Dep. 171:19–173:15.) Later that day, Suthar sent Coates a text apologizing for his earlier outburst, adding:

> Can you please stop talking about gold digging old guys and how lonely and desperate you are around me. I get that you're not interested but you've got to stop rubbing salt in the wound. You're not the only one who's painfully alone.

(Def.'s Br. Ex. I.) Coates did not respond, but testified that this message distressed her:

> It thoroughly stressed me out. I didn't know what to do. And to this point I thought maybe things would get better and they're not, and I didn't know what to do. But I need a paycheck every month and I need to put a roof over my head and food on my table and pay my bills, and I didn't know what to do.

- 6 -

(Coates Dep. 175:22–176:6.) Despite these incidents and the anxiety that they caused, Coates pressed on with her work. She continued to interact with Suthar several times a month, usually when she visited the office in Danville or when he came to Roanoke to work on a planned expansion of the business there. For Christmas that year, Suthar sent Coates a $500 Kate Spade gift card. (Coates Dep. 185:15–186:18.)

In January 2018, Suthar made his final romantic pitch to Coates over what was supposed to be a work dinner at a Mexican restaurant in Roanoke. When they arrived, Suthar asked to be seated in a "secluded" area, and Coates observed that he was very nervous. (Coates Dep. 201:9–202:8.) After they were seated, Suthar told Coates that he wanted her to marry him and have his children. Coates recalled:

> And my mind was racing, and then he proceeded to explain to me how much he liked me, and how much that work related [*sic*] we're great together, the only thing that's missing is me accepting his offer for a romantic relationship, is me saying yes, and about he has dated other people in the past that have been too young. And he has referenced that this person that he dated was someone from the pharmacy. He also referenced during this meeting about a previous marketer that worked there and about how they had a great relationship work-wise too, and they would work so closely together that sometimes she would call her husband's name Jay's name accidentally and back and forth, and it was like he was her work husband, as they would call it, and that he would have—I remember him saying specifically he would have married the shit out of her if she weren't married and accepted.
>
> And I remember him talking about building an empire and how we worked so great together professionally, the only thing that's missing is a romantic relationship too, and that we could build an empire together, like have children together. He's done messing around, he's done dating people that were younger, and that if I'm worried that it's a—if it's a work thing that I'm worried about,

> he has dated people that he's worked with before, that he was
> their boss and as the owner that it wasn't a problem.

(Coates Dep. 202:9–203:16.) Coates claims that she grew increasingly upset as Suthar talked, and she reminded him that she had a boyfriend. According to Coates, Suthar dismissed this, saying that he did not care and that he "wanted to continue to fight for" her. (Coates Dep. 203:19–20.) At this point in the conversation, Coates tried to explain how difficult his romantic interest was making her personal and professional lives:

> I expressed to him how much all of this upsets me and how I
> don't know—I'm not functioning properly at this point and that
> this has stressed me out for a while, and this is—what he is saying
> in this moment scared me and gave me so much anxiety as well
> as everything that that had happened up to this point and that—
> I expressed to him that I don't know if we can continue working
> together because clearly it is affecting me, it is affecting my work,
> it is affecting my life, it's affecting me 24/7. I told him how
> stressed out I was by it. I told him that I would have anxiety,
> panic attacks, that this was not okay.

(Coates Dep. 209:1–14.) Suthar, obviously dejected, simply responded: "[O]kay, well, good luck with your boyfriend." (Coates Dep. 209:16–19.) When Coates drove Suthar back to the airport after dinner, a ride that she described as "[b]eyond awkward and strange," she suggested that she look for another job, adding, "I don't know if I can continue this job." (Coates Dep. 210:4–13.) According to Coates, Suthar begged her to stay and not leave the company.[4] (Coates Dep. 210:11–13.)

---

[4] Suthar has provided a starkly different account of his interactions with Coates. In sum, Suthar claims that Coates was the aggressor, that she repeatedly expressed a romantic interest in him, and that *she* regularly initiated inappropriate physical contact—touching his shoulders and arms, rubbing her foot against his leg—during their meetings. (*See* Jay Suthar Dep. 60:2–63:9, Nov. 4, 2020 [ECF No. 60-2].) According to Suthar, he tried to rebuff those advances. For purposes of summary judgment, however, the court must accept Coates's version of their interactions as true and cannot make any credibility determinations. Ultimately, the jury will decide who is more believable on this issue.

Following this January 2018 dinner and her final rejection of his romantic advances, Coates alleges that Suthar began to lay the foundation for terminating her employment. She contends he excluded her from meetings about the Roanoke business expansion, even though it was within her marketing territory. Coates also alleges that Suthar started demanding, for the first time, that she report her sales calls and other information into a new software system by 9:00 a.m. each morning. Coates was routinely late in filing these reports and blames the software, which she and others described as unreliable and difficult to navigate. (Coates Dep. 216:3–226:10; Jason Bell Dep. 12:20–13:14, Nov. 6, 2020 [ECF No. 60-5].) Coates asked for IT assistance and ways to work around the technological issues that she faced, but her requests generally fell on deaf ears. Around the same time, Suthar began complaining to Breslow about Coates's performance and her sales numbers in Roanoke. This struck Breslow as odd. He testified that he thought Coates "was doing a good job as far as bringing in business and keeping the business." (Breslow Dep. 13:17–19.) In fact, according to Coates and confirmed by Breslow, Coates helped achieve record sales numbers in her territory through the spring and into the summer of 2018.[5] (Breslow Dep. 18:22–20:3. *See generally* Decl. of Allison Coates ¶¶ 6–19; 26–29, Nov. 25, 2020 [ECF No. 60-13].)

Shortly after the January dinner, Coates informed Breslow, one of her supervisors, about Suthar's conduct, including the marriage and "empire" proposition, and her refusal.

---

[5] Suthar acknowledges the increase, but he contends that Coates simply benefited from sales of a blockbuster nutraceutical vitamin, developed by one of the company's pharmacists, to a physician in Blacksburg. Breslow, the pharmacist-in-charge at the time, testified that Coates deserved some credit for this increase because the prescribing doctor was in her territory and she assisted in convincing the doctor to prescribe the vitamin. (Breslow Dep. 18:8–19:2.)

With this background, Breslow testified that he began to understand why Suthar had suddenly turned on her:

> But, you know, he never had anything bad to say about Allison, and then all of a sudden, he didn't have anything good to say about Allison, yet sales were up and number of doctors. . . . I started warning Allison that she was going to get fired, and she should start looking for another job. Then we hired Jason [Bell] to be the director of sales and marketing in June [2018]. So he started first of July, which I thought was good, because then Allison would report to Jason and not Jay, and have a little bit of a buffer there and, hopefully, we would all get a fresh start. That didn't seem to materialize.

(Breslow Dep. 15:9–17:5.) As noted by Breslow, in June, Suthar hired Jason Bell to fill the newly created position of director of marketing. In his new role, Bell would supervise Coates. Immediately after Bell was hired, Suthar told him that he was thinking of terminating Coates. Bell protested and asked for an opportunity to meet her first and make his own determination. Bell recalls that he told Suthar: "No, don't let Allison go. Like I said, I'm brand new, let me work with her. Give me some time to work with her." (Bell Dep. 10:9–12.) Although Bell suspected that Coates's delays in submitting the early-morning summaries might be attributable to getting a late start on the workday, he did not have any evidence to confirm that. (Bell Dep. 24:9–21.) But Suthar did not give Bell time to work with Coates and assess her performance for himself. Several weeks later, Suthar fired Coates by email while Bell was out of town at a golf tournament.

After firing Coates, Suthar instructed Bell to compile a record of her sales calls and other performance data, a task that Bell recalls took him nearly two days to complete. (Bell Dep. 21:17–22.) Bell later learned that Suthar had requested this information after learning that a lawyer was going to investigate allegations of sexual harassment against Suthar. Bell says

that, up until that point, he had been unaware of Suthar's alleged romantic advances towards Coates, but he "put two and two together that I'm getting stuff together because obviously she's pissed off and there might be some type of lawsuit or wrongful termination." (Bell Dep. 27:4–8.)

After Suthar fired her, Coates filed a charge of discrimination with the Equal Employment Opportunity Commissioner and received her "Notice of Right to Sue" on September 20, 2019. She filed suit in this court on December 10 of that year. (ECF No. 1.) Kare moved to dismiss that complaint, and the court dismissed her complaint with leave to amend.[6] (ECF No. 25.) She filed an amended complaint on July 14, 2020 (ECF No. 27), and a second amended complaint on July 29 (ECF No. 33). Following discovery, Kare moved for summary judgment on November 20. (ECF No. 55.) The motion has been fully briefed by the parties, and the court heard oral argument on December 11, making the motion ripe for decision.

## II.   <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a

---

[6] The Hon. Jackson L. Kiser initially presided over this case and granted the defendant's motion to dismiss with leave to amend. The undersigned took over in the fall of 2020, after the filing of the amended complaint but prior to the filing of the instant motion for summary judgment.

fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving

party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III.  ANALYSIS AND DISCUSSION

Kare makes three principal arguments in support of its motion for summary judgment: (1) that Coates relies on inadmissible evidence to refute its statement of undisputed material facts; (2) that Suthar's conduct towards Coates was not severe or pervasive enough to create an objectively hostile work environment under Title VII; and (3) that Coates cannot establish a *prima facie* case of retaliation because she cannot show a causal connection between any protected activity and her termination.

### A. "Inadmissible" Evidence

As a threshold matter, Kare contends that Coates relies on inadmissible hearsay evidence "to manufacture a factual dispute." This argument is belied by the record.

In assessing the evidence presented by the parties on a motion for summary judgment, a court may only consider evidence that would be admissible at trial. *See Md. Highways Contractors Ass'n, Inc., v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991); *Gregory v. Bruce*, [needs docket number], 2018 U.S. Dist. LEXIS 39387, at *25 (M.D.N.C. Mar. 9, 2018); *Powell v. Town of Sharpsburg*, [needs docket number], 2009 U.S. Dist. LEXIS 25356, at *15 (E.D.N.C. Mar. 27, 2009). The court, therefore, must scrutinize the record—including deposition testimony and affidavits—to ensure that proffered evidence satisfies the requirements for admissibility under

- 13 -

the Federal Rules of Evidence. And as a rule, hearsay statements are not admissible—even for purposes of summary judgment. *See Md. Highways Contractors Ass'n, Inc.*, 933 F.2d at 1251–52.

The record evidence in the case mainly consists of the depositions of the parties and other Kare employees, as well as email and text-message communications between the parties. Throughout her lengthy deposition, Coates recalled, in vivid detail, her conversations with Suthar, including specific examples of his romantic advances over a six-month period. Coates's account of Suthar's various statements to her, which provide the core factual predicate for her claims against him, is not hearsay and is admissible. *See* Fed. R. Evid. 801(d)(2) (providing that a party's out-of-court statement, when offered by the opposing party, is not hearsay); Fed. R. Civ. P. 602 (establishing that a witness may testify to matters within her personal knowledge). The same is true with respect to Suthar's statements to Breslow, Bell, and other Kare employees; Coates can point to Suthar's out-of-court statements to other employees in arguing against summary judgment. *See* Fed. R. Evid. 801(d)(2). And it is not disputed that Suthar's written communications about matters in dispute—specifically his emails and text messages— are admissible. They, too, constitute admissions by a party opponent, and neither party has challenged their authenticity. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). In sum, the overwhelming weight of the evidence on which Coates relies to argue against the defendant's motion for summary judgment is not hearsay.

The defendant, however, raises a valid concern about certain statements cited by Coates that may constitute inadmissible hearsay. Specifically, the defendant points to

references in the plaintiff's opposition brief about a Kare employee stating that Suthar had hired Coates because he had the "hots" for her, and a similar statement by another employee about Suthar's interest in Coates. Because the plaintiff apparently cites these statements to prove the truth of the matter asserted—essentially that Suthar exhibited a romantic interest in Coates from very early in her tenure—they are ostensibly inadmissible hearsay, and the court will not consider them for purposes of evaluating the motion for summary judgment.[7]

Likely recognizing that the exclusion of these employees' comments does not alter, in a material way, the court's consideration of the remaining evidence in the record, the defendant attacks the plaintiff's extensive reliance "on her own testimony and an affidavit that she attached to the Opposition." (Def.'s Reply Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Reply"] pg. 4 [ECF No. 67].) In so doing, the defendant cites the Fourth Circuit's decision in *Evans v. Technologies Applications & Service Co.*, arguing that this court should "generally consider self-serving opinions without objective corroboration not significantly probative." 80 F.3d 954, 962 (4th Cir. 1996). This argument misreads *Evans*, which does not stand for the proposition suggested by the defendant—that a district court, in reviewing a motion for summary judgment, should not give weight to the plaintiff's deposition testimony about factual matters. To the contrary, *Evans* stands for the limited but important principle that, in weighing a party's *affidavit* on summary judgment, a court should be skeptical of "unsupported assertions," "self-serving opinions," and statements not based on personal

---

[7] The plaintiff could argue, however, that one or more of these statements might fall under the exclusion for "statements made by a party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). In any event, the court will not consider these statements for purposes of summary judgment.

knowledge. *Id.* (emphasis added). As summarized above and discussed in more detail below, the plaintiff's deposition testimony does not implicate these concerns. At bottom, Coates's detailed factual account of her interactions with Suthar is based on her personal knowledge, and key aspects are corroborated by witnesses and other admissible evidence. Although the defendant disputes the veracity of Coates's account and her arguments about its legal significance, the court must consider her testimony for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1)(A) (noting that deposition testimony is to be considered at summary judgment); *McAirlaids*, 756 F.3d at 310 ("It is an axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." (cleaned up)); *cf. Summerlin v. Edgar*, 809 F.2d 1034, 1039 (4th Cir. 1987) (finding error in the district court's conclusion that deposition testimony could not be used to dispute an affidavit).

### B. Hostile Work Environment Claim

The defendant next argues that Coates's hostile work environment claim fails "even when all the evidence and inferences are construed in her favor[,]" because the evidence does not meet the "demanding standard necessary to establish a hostile work environment." (Def.'s Reply pg. 7.) The court disagrees.

As an initial matter, it is necessary for the court to determine the precise nature of the plaintiff's Title VII claim. The defendant correctly points out that, in opposing their motion for summary judgment, the plaintiff asserts that the Supreme Court has abrogated the distinction between *quid pro quo* sexual harassment and claims based on hostile work environment in cases involving unlawful action by a supervisor, and that, in such cases, a

plaintiff does not have to prove the elements of these traditional claims. Plaintiff is incorrect on this key point. It is well established that the Supreme Court and the Fourth Circuit continue to recognize and distinguish between *quid pro quo* harassment and hostile work environment claims, and that plaintiffs, even those alleging actionable misconduct by their supervisors, must satisfy the long-standing requirements of these separate claims. *See Burlington Indus., Inc. v. Ellerth*, 523 U.S. 742, 753–54 (1998) (noting that, *once discrimination is shown via the quid pro quo or hostile work environment elements*, a separate inquiry, controlled by the court's decision, will determine whether an employer is vicariously liable for the discrimination); *Moser v. MCC Outdoor, LLC*, 256 F. App'x 634, 642 (4th Cir. 2007) (quoting *Ellerth* to set forth the elements of a *quid pro quo* claim, implying the validity of the distinction post-*Ellerth*); *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (setting forth the elements of a hostile work environment claim over 12 years after *Ellerth* was decided, implying that hostile work environment claims, and their requisite elements, continue to exist post-*Ellerth*).

The defendant also rightfully suggests that, in making these arguments in her opposition brief, Coates appears to raise a *quid pro quo* claim for the first time. The defendant's additional concerns are well-taken. The plaintiff's amended complaint undoubtedly raises a hostile work environment claim, not a *quid pro quo* claim,[8] and the court will apply the appropriate framework in analyzing it.

---

[8] At oral argument, Plaintiff asserted that she raised two claims in count one: sexual harassment and an overarching "sex discrimination" claim. The court has reviewed Plaintiff's second Amended Complaint (ECF No. 33) and concludes that only a hostile work environment claim has been raised. *See, e.g.*, *Henderson v. McClain*, No. 7:19cv00685, 2020 WL 6136850, at *5 (W.D. Va. Oct. 19, 2020) (declining to read a complaint to assert a claim when "the complaint cannot be read to state a claim to relief under that theory"). As a general rule, plaintiffs should allege and describe separate causes of action in separate counts. *See* Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 10(b) (directing parties to set out each claim "in a separate count").

Under Title VII, employers are prohibited from discriminating against individuals "[w]ith respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. "Since an employee's work environment is a term and condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf Home, LLC*, 775 F.3d 202, 207 (4th Cir. 2014). A plaintiff alleging a hostile work environment must prove four elements: (1) that there was unwelcome conduct; (2) that the unwelcome conduct was based on her sex; (3) that the unwelcome conduct was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive working environment; and (4) that the conduct is imputable to the employer. *Id.*; *Okoli*, 648 F.3d at 220 (*quoting Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010)).

Kare argues it is entitled to summary judgment on this claim because Suthar's conduct, viewed in the light most favorable to Coates, does not satisfy the third element of a hostile work environment claim—that the conduct was severe or pervasive.[9] This third prong has both subjective and objective components, and it requires a plaintiff to establish that "she perceived—and that a reasonable person would so perceive—the environment to be abusive and hostile." *Walker*, 775 F.3d at 208. In applying this test, the court must consider the totality of the circumstances faced by the plaintiff, including: "the frequency of the discriminatory

---

[9] It is undisputed that Coates has satisfied the other three elements of this claim. There is ample evidence to support Coates's contention that Suthar's persistent romantic advances were "unwelcome," and Suthar undoubtedly directed his attention towards Coates "because of her sex." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) ("An employee is harassed or otherwise discriminated against because of his or her gender if, but for the employee's gender, he or she would not have been the victim of discrimination."). Finally, Suthar's conduct is imputable to the defendant because he was the COO and  part owner, rather than a low-level employee. *See, e.g.*, *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) ("Under Title VII, an employer can be vicariously liable for a hostile work environment created by a supervisor[.]").

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). This test is intended to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). But this test is also intended to protect "working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

On the one hand, Suthar's conduct towards Coates is distinguishable from that of defendants in many hostile work environment cases. It is undisputed that he never made unwanted physical advances towards Coates; he did not use sexually explicit language with her; and he did not display or transmit sexually provocative or offensive images. But on the other hand, the nature of Suthar's behavior towards Coates was more than "ordinary socializing in the workplace—such as . . .  intersexual flirtation." *Oncale v. Sundower Offshore Servs, Inc.*, 523 U.S. 75, 81 (1998).

As described in detail above, Coates's testimony establishes that, from the time Suthar hired her to work at his company, Suthar embarked on an unrelenting and grinding campaign to win Coates's affection. When viewed in isolation, none of his acts constituted patently offensive or abusive conduct. But, when considered collectively, Suthar's comments and conduct, including making remarks about watching her during sales calls and liking her too much; constantly asking her out to dinner; inviting her to accompany him on a private plane with a stopover in Richmond if he was feeling "saucy"; sending a sexually suggestive text

message at 1:30 in the morning regarding him not wearing pants; berating and humiliating her in front of her direct supervisor out of romantic jealously; and propositioning her to marry him, have his children, and "build an empire" during a work dinner, lead to the valid conclusion that a reasonable person in Coates's shoes would perceive that working environment to be abusive and hostile. *See Okoli*, 648 F.3d at 222 ("Overall, Okoli presents a strong claim for hostile work environment, when objectively viewing the severity of the harassment from the perspective of a reasonable person in the plaintiff's position." (cleaned up)); *see also Walker*, 775 F.3d at 208 ("The totality of the record before us creates too close a question as to whether [the defendant's] behavior created an objectively hostile or abusive work environment to be decided on summary judgment.").

While this case lacks some of the indicia of traditional hostile work environment claims, it presents a unique and, in the court's view, aggravating element—a substantial disparity in power. As previously stated, when considering whether a work environment is hostile, "[a]ll the circumstances are examined . . . ." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) (en banc); *see also Oncale*, 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). This court is keenly aware that "[t]he specific circumstances of the working environment and the relationship between the harassing party and the harassed . . . bear on whether that line [into actionable conduct] is crossed." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017). Moreover, "[w]hen evaluating the context in which harassment takes place, [the Fourth Circuit has] often focused on the 'disparity in power between the harasser and the victim.'" *E.E.O.C. v. Fairbrook*

*Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008)).

In *Jennings v. University of North Carolina*, a former UNC soccer player sued the university, claiming that Anson Dorrance, the legendary women's soccer coach, created a hostile or abusive environment in violation of Title IX by, *inter alia*, engaging in sexually explicit conversations with his players and asking inappropriate, probing questions of them, both in front of other team members and in private. 482 F.3d at 691. In reversing summary judgment and remanding the case to the district court, the Fourth Circuit noted:

> Dorrance was not just any college coach. He was and still is the most successful women's soccer coach in U.S. college history, and he has coached the national team. Dorrance thus had tremendous power and influence over a player's opportunity for achievement in the soccer world, both at UNC and beyond. . . . *The disparity in power between Dorrance and his players* trapped players into responding to his [disrespectful and degrading] questions and enduring the environment.

*Id.* at 696 (emphasis added). Likewise, in *E.E.O.C. v. R&R Ventures*, the Fourth Circuit concluded that "the severity of Wheeler's [the harasser's] sexual misconduct was compounded by the context in which it took place. Throughout his campaign of torment, Wheeler was an adult male in a supervisory capacity over young women barely half his age." 244 F.3d 334, 340 (4th Cir. 2001). And in *E.E.O.C. v. Fairbrook Medical Clinic*, the Fourth Circuit held that "a jury could . . . conclude that [the] severity of Kessel's [the harasser's] conduct was exacerbated by the fact that he was not only Waechter's [the victim's] immediate supervisor but also the sole owner of Fairbrook [the medical clinic where Waechter worked]. Unlike one of Waechter's fellow employees, Kessel had significant authority over her on a day-to-day basis and the ability to influence the rest of her career." 609 F.3d at 329.

Like Kessel in *Fairbrook Medical Clinic*, Suthar was not a mere coworker, and he was much more than Coates's supervisor. He was the COO and part owner of the company. He had unlimited power and discretion over the terms and conditions of his employees' jobs— plenary power that he consistently wielded to Coates's detriment. In sum, the evidence, viewed in the light most favorable to Coates, suggests that Suthar made the unilateral decision to hire Coates right out of college; he thereafter doggedly pursued his romantic interest in ways that undermined her professional and personal wellbeing; and, when his efforts finally proved futile, he terminated her employment. This disparity in power was not insignificant, and it tips the analysis in favor of the plaintiff for purposes of summary judgment. *See Okoli*, 648 F.3d at 221 (overturning the district court's granting of summary judgment to the defendant on a hostile work environment claim after considering the disparity of power between the defendant, a high-ranking city official, and the plaintiff, "a new secretary whose job required her to have a lot of one-on-one contact with her boss," in conjunction with the alleged severe and pervasive conduct).

## C. Retaliation Claim

In support of its motion for summary judgment on Coates's retaliation claim, the defendant essentially makes two arguments: (1) that Coates cannot establish a *prima facie* case of retaliation because she cannot show a causal connection between any protected activity and her termination; and (2) that even if Coates could make out a *prima facie* case, it is still entitled to summary judgment because it terminated her for legitimate, nonretaliatory reasons. Neither argument is persuasive.

Plaintiffs claiming retaliation under Title VII must satisfy the burden-shifting structure set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case, Coates must show that: (1) she engaged in a protected activity; (2) the defendant acted adversely against her; and (3) the protected activity was the but-for cause of her termination, rather than just a motivating factor. *Walker*, 775 F.3d at 210; *Okoli*, 648 F.3d at 223. Once a plaintiff has made a *prima facie* showing, the burden shifts to the defendant to provide a legitimate, nonretaliatory explanation for its decision to terminate her. If the defendant makes that showing, the burden shifts back to Coates to show that Kare's proffered reason was pretext for retaliation. *Id.* The burden on the defendant is only a burden of production; the burden of persuasion always remains with the plaintiff. *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Coates has made the requisite *prima facie* showing of retaliation. In its brief and at oral argument, Kare conceded that Coates had engaged in a protected activity.[10] The overwhelming

---

[10] The court therefore assumes, for purposes of summary judgment, that Coates engaged in a protected activity at some point, but notes that pinpointing exactly when she did is not so simple. The question of whether merely declining a supervisor's romantic advances constitutes a protected activity is unsettled. *Compare Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding that an employee "engage[s] in the most basic form of protected activity when she [tells] her supervisor . . . to stop his offensive conduct), *and E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) ("[A] demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII."), *with LeMaire v. Louisiana*, 480 F.3d 383, 389 (5th Cir. 2007) (observing that "the only arguable protected activity" was the plaintiff's "actual rejection of [the harassing supervisor's] advances" and that the plaintiff had provided "no authority for the proposition that rejecting sexual advances constitutes a protected activity for the purposes of a retaliation claim under Title VII"). "The Fourth Circuit has not addressed the question of 'whether a person who rejects a supervisor's sexual advances has engaged in a protected activity.'" *Owen v. Cnty. of Fairfax*, 358 F. Supp. 3d 545, 550 (W.D. Va. 2019) (quoting *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008)). Just last year, the Honorable Glen E. Conrad of this court sided with the Sixth and Eighth Circuits, holding "that an employee engages in protected activity when the employee asks a supervisor to stop his sexually harassing behavior." *Id.* at 551. The court is not prepared to say that declining an invitation to go on a date with a supervisor is the same as "ask[ing] a supervisor to stop his sexually harassing behavior," *id.*, because declining an invitation is not the same as telling someone to *stop* asking and because simply asking a subordinate on a date—while unwise—is neither unlawful under Title VII nor *per se* "harassing." Nevertheless, the court finds that Coates's January 2018 conversation with Suthar, where she expressed to Suthar that his repeated entreaties were wreaking havoc in her personal and

evidence indicates that, after Coates engaged in protected activity, the defendant—by and through Suthar—took adverse action against her, and that Coates's refusal to submit to Suthar's romantic desires was the but-for cause of his ultimate decision to fire her. Coates has provided compelling evidence of the dramatic change in Suthar's demeanor towards her following the January dinner, Suthar's efforts to put new and burdensome demands on her, and the general animus he exhibited towards her and in conversations with others about her, all of which culminated in his unilateral decision to fire her seven months later. But the strongest evidence on this point is provided by Breslow, who vividly recalled Suthar—who up until that time had nothing but positive things to say about Coates—suddenly having only negative things to say about her. (Breslow Dep. 15:19–17:5.) Based on this marked change in Suthar's demeanor, Breslow presciently concluded that the writing was on the wall, and he warned Coates that she would be fired. (Breslow Dep. 16:21–23.)

Defendant argues that the seven-month delay between the January dinner and Coates's termination—a lack of temporal proximity—undermines Coates's claim of a direct correlation. *See, e.g.*, *King v. Pulaski Cnty. Sch. Bd.*, 195 F. Supp. 3d 873, 885 (W.D. Va. 2016). While it is true that Suthar did not actually terminate Coates's employment until August, it is more than plausible that he began to lay the groundwork for that adverse action almost immediately after she rebuffed him at the January dinner. Simply put, given the evidence of Coates's generally positive track record and development until that time, as established by Coates and Breslow,

---

professional lives, would constitute asking Suthar to stop and thus qualify as a complaint about what she reasonably perceived to be a hostile work environment. It would therefore be an act "oppos[ing] [a] practice made an unlawful employment practice by" Title VII, 42 U.S.C. § 2000e-3(a). *See also Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003) (noting that one engages in a protected, oppositional activity when she complains about a practice she subjectively believes is unlawful, so long as that belief was objectively reasonable).

Suthar had a lot of work to do before he could fire her. Though a great deal of time elapsed between Coates's protected activity and her termination, Coates's evidence suggests it was only a matter of *days* before Suthar began a campaign to undermine, and ultimately fire, her.

Kare further argues that, even if Coates can establish a *prima facie* case, the defendant has established she was terminated for legitimate, nonretaliatory reasons. In support of this claim, it points to a 30% decline in sales during the month of December 2017, Coates's difficulties utilizing certain software to log her call notes, and Suthar's anger about having to pay her significant commissions for huge increases in her sales numbers during the late spring and early summer of 2018. Indeed, Bell lends some support to the latter claim, testifying that, in his opinion, the commission issue contributed to Suthar's decision to fire her. (Bell Dep. 60:7–13.) But even assuming that Suthar was motivated, in part, by not wanting to pay Coates larger commissions, Coates has presented more than sufficient evidence that her resistance to Suthar's final romantic proposal was the but-for cause of her termination. As the Fourth Circuit noted in *Okoli*, "[a]ny dispute about [the defendant's] alternative, legitimate basis for firing her returns to the question of mixed-motives and pretext. For the purposes of summary judgment, [the plaintiff] has eliminated legitimate reasons for her firing, so it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration." 648 F.3d at 225 (citing *Funco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (internal quotation marks omitted)). Such is true here, and Coates is entitled to have a jury sort it out.

IV.   **CONCLUSION**

For the reasons stated, the court will deny the defendant's motion for summary judgment.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 14th day of December, 2020.


_____/s/ Thomas T. Cullen_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE